**PRUDENTIAL INS. CO. OF AMERICA v. PETRIL et al.**

**No. 1727 Civil.**

District Court, E. D. Pennsylvania.

Feb. 20, 1942.

Kendall H. Shoyer, of Philadelaphia, Pa., for plaintiff.

Ellis Rudman, of Philadelphia, Pa., for defendant.

KALODNER, District Judge.

Is it against the public policy of Pennsylvania to permit recovery by the beneficiary of an insurance policy on the life of a murderer convicted and executed for his crime?

This issue is presented in the instant action for a declaratory judgment brought by the plaintiff insurance company to determine its obligation on a policy of life insurance written by it.

The facts as they appear in the complaint are as follows:

On May 18, 1936, the plaintiff insurance company issued a policy on the life of Paul Petrillo in the amount of $5,000 with a beneficiary clause in favor of his wife, the defendant Angelina Petrillo. (Louis Petril, the brother of the insured, is joined as a defendant because of an attempt to name him as a beneficiary.) The insured was tried and convicted for murder and was electrocuted on March 31, 1941. All the premiums on the policy were paid. The complaint seeks to have the court declare the policy unenforceable by reason of the "public policy" of the Commonwealth of Pennsylvania. The defendants' amended motion to dismiss is premised on the contention that as a matter of law no public policy exists in Pennsylvania which makes the policy unenforceable.

The amended motion to dismiss sets forth that the insured was indicted for murder on June 21, 1939, by the Grand Jury of the County of Philadelphia, Commonwealth of Pennsylvania; pleaded "not guilty" on July 20, 1939; changed his plea to "guilty" on September 28, 1939; was adjudged "guilty of murder in the first degree" with the penalty of death by the Court of Quarter Sessions and Oyer and Terminer of the County of Philadelphia on February 23, 1940; that an appeal was taken to the Supreme Court of Pennsylvania on April 9, 1940, which affirmed the judgment and sentence on October 28, 1940 (Commonwealth v. Petrillo, 340 Pa. 33, 16 A.2d 50); that on November 22, 1940, an application was made to the Pennsylvania Board of Pardons for a pardon, which was denied on February 24, 1941; and that the insured died by electrocution on March 31, 1941; that during all this time the plaintiff sent quarterly notices to the insured's residence, and all the premiums (including the last one, thirteen days before the electrocution) were paid by the wife, Angelina Petrillo.

The plaintiff has filed an affidavit "Contra Defendants' Motion to Dismiss" wherein it merely controverts that payments were made by the wife and avers that they were paid by the insured or by some person other than the wife.

The plaintiff maintains that the law of Pennsylvania governs because the application for insurance was made in Pennsylvania; that the policy (though executed in New Jersey) was delivered and the first premium paid in Pennsylvania.

There is no doubt that this is a Pennsylvania contract: See Northwestern Mutual Life Insurance Company v. McCue, 1911, 223 U.S. 234, 32 S.Ct. 220, 56 L.Ed.

419, 38 L.R.A.,N.S., 57. Accordingly, the Pennsylvania law governs: See Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

On the basic issue plaintiff relies chiefly on the case of Collins v. Metropolitan Life Insurance Co., 1905, 27 Pa.Super. 353. The facts in that case are almost identical to the case at bar with the important exception that *the proceeds of the insurance in the Collins case were made payable to the legal representative of the deceased murderer.* Recovery was denied on the grounds of public policy. I quote at length from the opinion in the Collins case as it attempts to set forth the rationale (pages 356, 357, 358 of 27 Pa.Super.):

" * * * The question, therefore, is whether an ordinary life policy, containing no applicable special provisions, is a binding contract to insure against a legal execution for crime.

"Had the policy expressly insured against this risk: that is, that in consideration of the insured paying a certain sum of money, year by year, the company would, in the event of his committing capital felony, and being tried, convicted and executed for that felony, pay to his legal representatives a certain sum of money; such a contract could not be sustained. It must be held to be void upon principles of public policy. 'Would not such a contract (if available) take away one of those restraints operating on the minds of men against the commission of crimes; namely, the interest we have in the welfare and prosperity of our connections? Now, if a policy of that description, with such a form of condition inserted in it in express terms cannot, on grounds of public policy, be sustained, how is it to be contended that in a policy expressed in such terms as the present, and after the events which have happened, that we can sustain such a claim? Can we, in considering this policy, give to it the effect of that insertion, which if expressed in terms would have rendered the policy, as far as that condition went at least, altogether void?' The Amicable Society v. Bolland et al., 4 Bligh's New Rep. 194. A contract, the tendency of which is to endanger the public interests or injuriously affect the public good, or which is subversive of sound morality, ought never to receive the sanction of a court of justice or be made the foundation of its judgment. As a life policy which

expressly covenanted against a legal execution of the insured for crime would be void as against public policy, so an ordinary policy, containing no applicable special provisions, is not to be construed as insuring such a risk. Public policy forbids the insertion in the contract of a condition which would tend to induce crime, and as it forbids the introduction of such a stipulation it also forbids the enforcement of a contract under circumstances which cannot be lawfully stipulated for: Hatch v. Mutual Life Insurance Company, 120 Mass. 550 [21 Am.Rep. 541]; Wells v. [New England Mut. Life] Insurance Company, 191 Pa. 207 [43 A. 126, 53 L.R.A. 327, 71 Am.St.Rep. 763]; Ritter v. Mutual Life Insurance Company, 169 U.S. 139, 18 S.Ct. 300 [42 L.Ed. 693]; Burt v. Union Central Life Insurance Company, 187 U.S. 362, 23 S.Ct. 139 [47 L.Ed. 216]. The reason for the refusal of the courts to aid one who founds his cause of action upon his own criminal act is because of the public interests involved, which require that the laws against crime be enforced *and that the courts aid no man to take a profit from their violation.* The rule is enforced upon the ground of public policy alone, and not out of consideration for the defendant, to whom the advantage is incidental: Coulon v. Morton, 4 Yeates [Pa.], 24; Mitchell v. Smith, 1 Bin. [Pa.], 110 [2 Am.Dec. 417]; Scott v. Duffy, 14 Pa. 18; Seidenbender v. Charles, 4 Serg. & R. [Pa.], 151 [8 Am.Dec. 682]; Unger v. Boas, 13 Pa. 601; Fowler v. Scully, 72 Pa. 456 [13 Am.Rep. 699]; Holt v. Green, 73 Pa. 198 [13 Am.Rep. 737]; Thorne v. [Travellers'] Insurance Co., 80 Pa. 15 [21 Am.Rep. 89]; Columbia Bank & Bridge Co. v. Haldeman, 7 Watts & S., Pa., 233 [42 Am.Dec. 229]." (Emphasis supplied.)

To paraphrase the language of the decision concisely, it holds that it is against the public policy to covenant "against a legal execution of the insured for crime" so as to permit a person to profit by a violation of the law.

With the same thought in mind, in the case of Wells v. New England Mut. Life Insurance Co., 1899, 191 Pa. 207, 43 A. 126, 53 L.R.A. 327, 71 Am.St.Rep. 763, recovery was not permitted by the *administrator* of the deceased insured who died as a result of a voluntary illegal abortion.

It was similarly held in Elwood v. New England Mutual Life Ins. Co., 1931, 305

Pa. 505, 158 A. 257, where recovery was denied to the insured under the permanent disability clause of the policy because the disability arose from the insured's unsuccessful attempt to commit suicide. The policy contained an incontestability clause in the event of suicide after one year. The insured contended therefore that this clause operated to make incontestable his claim for injuries in the unsuccessful suicide attempt made after the policy was a year old. In disposing of this contention, the court said (pages 512, 513 of 305 Pa., page 259 of 158 A.):

"Had suicide been actually consummated, this may be admitted and yet not reach the question posed on this record. We are not dealing with suicide accomplished, but with an attempt at self-murder; *not with the rights of a beneficiary who is himself guilty of no wrongdoing,* but with those claimed by the insured who himself has been guilty of one of the great moral wrongs, of a crime infamous at common law, if completed, a species of felony (8 R.C.L. 351). * * *

"We are of opinion that the suicide cases, those in which self-destruction was accomplished, should not control such a case as this; that the guiding principle is different. *A principle of public policy, operating on the wrongdoer himself, is and should be invocable here, which cannot be applied against a surviving beneficiary who is guiltless of any act contrary to good morals.*" (Emphasis supplied.)

The Elwood case thus clearly distinguishes between "the rights of a beneficiary who is himself guilty of no wrongdoing" and the rights of "the wrongdoer himself" as affected by the public policy of the State.

In Allegheny Trust Co. v. State Life Insurance Co., 110 Pa.Super. 37, 167 A. 251, the Superior Court of Pennsylvania held that a contract permitting a recovery on a policy in case of suicide after one year of its issue is not against public policy in Pennsylvania.

Again, in Longenberger et al., Adm'rs, v. Prudential Insurance Company of America, 1936, 121 Pa.Super. 225, 183 A. 422, the Superior Court of Pennsylvania quoted with approval the distinction made in the Elwood case between the rights of the wrongdoer himself and the rights of a

beneficiary guilty of no wrongdoing. Of particular interest is the statement in the Longenberger case that, in the absence of any provision in a contract of insurance that the policy shall be void in the event of the insured's suicide, the wife-beneficiary may recover. Said the court (pages 228, 229 of 121 Pa.Super., page 424 of 183 A.):

"The following legal principles are well established in this state:

"(1) An insurer may insert in the contract of insurance a valid stipulation that the policy shall be void if the insured shall die by his own hand. * * *

"(2) In the absence of such a stipulation or provision, a policy in favor of the insured's wife as beneficiary will not be avoided by the suicide of the insured. Morris v. State Mutual Life Assur. Co., 183 Pa. 563, 39 A. 52, 55; Marcus v. Heralds of Liberty, 241 Pa. 429, 436, 88 A. 678. In the former case, the court, by Mr. Justice Dean, said: 'We are not called upon to decide what would have been the effect on the contract if the policy itself had been payable to the insured, or to his personal representatives.' The decision was based on cases[1] involving policies payable to the wife, without any change of beneficiary reserved to the insured."

Now, since suicide is self-murder and a felony, and the Pennsylvania courts have ruled that the innocent beneficiary of a policy on the life of the suicide may recover, and that such recovery is not against the public policy of the State, it seems clear that the doctrine of the Collins case has been limited by the Pennsylvania Appellate Courts to the particular facts in that case. It must be kept in mind that the Collins case was specifically discussed by the court in both the Elwood and the Longenberger cases.

Obviously, therefore, the decisions in the suicide cases do not follow the logic that flows from the abstract principles of the Collins case, for it is neither the commission of the crime nor causing an enrichment that *necessarily* voids the insurance. There is a common sense justice in those decisions which otherwise would be repugnant to the protection that a life insurance policy is intended to secure and which dialectic should not defeat.

■ A study of the Pennsylvania cases discloses that the principle of public policy

---

"[1] Gibbons v. Gibbons, 175 Pa. 475, 34 A. 846; Matlack v. Mutual Life Ins. Co., 180 Pa. 360, 36 A. 1082."

which bars recovery for the casualty brought on by the criminal act is confined to those instances where the criminal *himself* or the criminal's estate benefits, and in cases of suicide the whole theory vanishes into thin air and recovery is permitted except as limited by the contract itself.

No Pennsylvania case has been cited, and the court has been unable to find any, where the rights of a beneficiary of a murderer (other than his personal representatives) were considered. The cases in other jurisdictions are in conflict. A most admirable and enlightening discussion of the subject matter is contained in Fields v. Metropolitan Life Ins. Co., 1923, 147 Tenn. 464, 249 S.W. 798, 36 A.L.R. 1250, where the personal representatives of the murderer were allowed to recover. This case goes into the basis of the public policy and explains the conflicting decisions so thoroughly that this court is constrained to quote at length from the opinion (page 472 of 147 Tenn., page 800 of 249 S.W., 36 A.L.R. 1250):

" 'We are aware that courts have not always reached the same conclusion upon this question. So far as we are advised, all the cases in which the opposite conclusion has been reached are based upon the English case, Amicable Society v. Bolland, 4 Bligh (N.R.) 194, decided by the House of Lords in 1830. * * * It should be borne in mind that forfeitures for the commission of crime were enforced in England at the time of this decision, and continued to be, with more or less severity, until abolished by 33 and 34 Victoria, passed in 1870. (1 Bouvier's Law Dict. p. 446; Schouler on Wills, § 33.) The decision in the Bolland case was based on the ground of public policy, and no doubt was in strict accordance with the established policy of Great Britain at that time. As a declaration of the public policy of the English government at the time the decision was announced it must stand as conclusive evidence of such policy, but it is no evidence whatever that the same public policy prevails in any other nation or government. Each nation or state having the power to adopt a constitution and legislate for itself necessarily has the inherent power to declare its own rules of public policy. There is nothing in international law or the comity between our states that requires our courts to enforce the consequences following the conviction for felony in obedience to the public policy of the state where the conviction is had, when to do so would be to depart from our own public policy on the same subject. A few citations will establish this principle.' [Quoted with approval from Collins v. Metropolitan Life Ins. Co., 232 Ill. 37, 83 N.E. 542, 14 L.R.A.,N.S., 356, 122 Am.St. Rep. 54, 13 Ann.Cas. 129.]

"The American cases which hold contrary to the Illinois case above are as follows: Burt v. Union Central Life Ins. Co., 187 U.S. 362, 23 S.Ct. 139, 47 L.Ed. 216; Northwestern Mutual Life Ins. Co. v. McCue, 223 U.S. 234, 32 S.Ct. 220, 56 L. Ed. 419, 38 L.R.A.,N.S., 57; Collins v. Metropolitan Life Ins. Co., 27 Pa.Super. 353; Knights of Golden Rule v. Ainsworth, 71 Ala. [436], 447, 46 Am.Rep. 332; American National Ins. Co. v. Munson, Tex.Civ.App., 202 S.W. 987; Scarborough v. American Nat'l Ins. Co., 171 N. C. 353, 88 S.E. 482, L.R.A.1918A, 896, Ann. Cas.1917D, 1181.

"No one of these cases discussed the constitutional provision respecting attainders and forfeitures above referred to. Each one of them is based upon the English case of Amicable Society v. Bolland, English Reports, Full Print, House of Lords, Book 6, Bligh N.S. 10, 11, Dow & Clark, 1, 2, Clark & Finnelly, 1, 3."

The Constitution of the Commonwealth of Pennsylvania, P.S., provides:

Article 1, Section 18: "No person shall be attainted of treason or felony by the Legislature."

Article 1, Section 19: "No attainder shall work corruption of blood, nor, except during the life of the offender, forfeiture of estate to the Commonwealth. The estate of such persons as shall destroy their own lives shall descend or vest as in cases of natural death, and if any person shall be killed by casualty there shall be no forfeiture by reason thereof."

Applying these Sections of the Constitution, the Pennsylvania appellate courts have held that a murderer can inherit from the estate of his own victim: Carpenter's Estate, 1895, 170 Pa. 203, 32 A. 637, 29 L. R.A. 145, 50 Am.St.Rep. 765, the court saying: " * * * *These are provisions* [of the Constitution] *of the organic law which may not be transcended by any legislation.* Inasmuch as the prescribed penalty for murder is death by hanging, Crimes Act of 1860, § 75; Brightly, Purd. Dig. 429, pl. 142, without any forfeiture of estate or corruption of blood, it cannot

be said that any such consequences can be lawfully attributed to any such offense. In other words, our constitution positively prohibits any attaint of treason or felony by the legislature, and any corruption of blood by reason of attainder, or any forfeiture of estate, except during the life of the offender." (Emphasis supplied.)

An attempt was made to overcome the effect of the decision in Carpenter's Estate, supra, by Section 23 of the Intestate Act of June 7, 1917, P.L. 429, 20 P.S. § 136, which provided that: " * * * no person who shall be finally *adjudged guilty,* either as principal or accessory, of murder * * * shall be entitled to inherit or take any part of the real or personal estate of the person killed." (Emphasis supplied.)

In Re Tarlo's Estate, 1934, 315 Pa. 321, 172 A. 139, the murderer, after killing his victim, immediately committed suicide, and it was there held by the Supreme Court of Pennsylvania that the murderer's estate could inherit, and that the Act of 1917 did not apply because the murderer had not been "adjudged guilty" of the murder. The court did not discuss the constitutionality of Section 23 of the Act of 1917, supra, which was specifically repealed by Section 17 of the Act of August 5, 1941, P.L. 816, 20 P.S. § 3441, et seq.

Section 17 of the Act of August 5, 1941, also specifically repealed Section 22 of the Act of June 7, 1917, P.L. 403, 20 P.S. § 244, which provided:

"§ 244. Forfeiture of rights by murder of testator

"No person who shall be finally adjudged guilty, either as principal or accessory, of murder of the first or second degree, shall be entitled to take any part of the real or personal estate of the person killed, as devisee or legatee, or otherwise, under the will of such person."

It was in an apparent attempt to remedy the situation created by the decision in the Tarlo case, supra, that the Pennsylvania Legislature passed the Act of August 5, 1941, supra. That Act in its preamble provides: "An Act regulating and limiting the rights of slayers in real and personal property and in the benefits from insurance policies arising out of or as a result of the death of the person slain; protecting and saving the rights of purchasers and insurers dealing with slayers without notice of the slaying, and repealing certain legislation."

Section 2 of the Act of 1941, 20 P.S. § 3442, provides:

" § 3442. Slayer not to acquire property as result of slaying

"No slayer shall in any way acquire any property or receive any benefit as the result of the death of the decedent, but such property shall pass as provided in the sections following."

Sections 3 and 4 of this Act, 20 P.S. §§ 3443, 3444, provide that "The slayer shall be deemed to have predeceased the decedent [i. e., the victim] as to property * * *" which the slayer might otherwise inherit.

Section 11 of the Act, 20 P.S. § 3451, provides:

" §3451. Proceeds of insurance

" (a) Insurance proceeds payable to the slayer as a beneficiary or assignee of any policy or certificate of insurance on the life of the decedent, or as the survivor of a joint life policy, shall be paid to the estate of the decedent, *unless the policy or certificate designates some person not claiming through the slayer as alternative beneficiary to him.*

"(b) If the decedent is beneficiary or assignee of any policy or certificate of insurance on the life of the slayer, the proceeds shall be paid to the estate of the decedent upon the death of the slayer, *unless the policy names some person other than the slayer or his estate as alternative beneficiary,* or unless the slayer by naming a new beneficiary or assigning the policy performs an act which would have deprived the decedent of his interest in the policy if he had been living." (Emphasis supplied.)

Section 13 of the Act, 20 P.S. § 3453, provides:

" § 3453. Bona fide purchasers

"The provisions of this act shall not affect the rights of any person who, before the interests of the slayer have been adjudicated, purchases from the slayer for value and without notice property which the slayer would have acquired except for the terms of this act, but all proceeds received by the slayer from such sale shall be held by him in trust for the persons entitled to the property under the provisions of this act, and the slayer shall also be liable both for any portion of such proceeds which he may have dissipated and for any difference between the actual value of the property and the amount of such proceeds."

Section 15 of the Act, 20 P.S. § 3455, provides:

" § 3455. Broad construction; policy of state

"This act shall not be considered penal in nature, but shall be construed broadly in order to effect the policy of this state that no person shall be allowed to profit by his own wrong, wherever committed."

■ I have quoted at length from the Act of 1941 in view of the fact that it constitutes the latest expression—legislative or judicial—as to the public policy of Pennsylvania on the subject. It is, of course, well settled that the constitution, laws and judicial decisions of a State are to be considered in determining its public policy. As was stated in Twin City Co. v. Harding Glass Co., 283 U.S. 353, 357, 51 S.Ct. 476, 478, 75 L.Ed. 1112, 83 A.L.R. 1168: "Primarily it is for the lawmakers to determine the public policy of the state."

Also, as was stated in United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 340, 341, 17 S.Ct. 540, 559, 41 L.Ed. 1007: "The public policy of the government is to be found in its statutes, and, when they have not directly spoken, then in the decisions of the courts and the constant practice of the government officials; *but when the lawmaking power speaks upon a particular subject, over which it has constitutional power to legislate, public policy in such a case is what the statute enacts.* If the law prohibit any contract or combination in restraint of trade or commerce, a contract or combination made in violation of such law is void, whatever may have been theretofore decided by the courts to have been the public policy of the country on that subject." (Emphasis supplied.)

In Swarthmore Borough v. Public Service Commission, 277 Pa. 472, 478, 121 A. 488, 490, the Supreme Court of Pennsylvania stated with respect to a contract between a transit company and a borough: " * * * when these terms and conditions are reduced to a contract, they are protected by the organic law, subject to the right of the state to vary them, under the police power, when public interests so demand * * * but it is for the Legislature—and not the courts or the Public Service Commission—to declare the public policy of the state in this regard * * *."

Pausing then briefly to review legislation relating to the status of murderers with respect to their right of inheritance or benefit or of others affected by the act of the murderer, we find:

(1) That under Section 23 of the Intestate Act of June 7, 1917, supra, "no person who shall be finally *adjudged guilty,* either as principal or accessory, of murder * * * shall be entitled to inherit or take any part of the real or personal estate of the person killed", and that Section 22 of the Act of June 7, 1917, provided that "no person who shall be finally *adjudged guilty,* either as principal or accessory, of murder of the first or second degree, shall be entitled to take * * * under the will of * * *" the person killed;

(2) That following the decision in the Tarlo case—which ruled that because the murderer had himself died by suicide before he was *"adjudged guilty"* the murderer's estate could inherit—the legislature of Pennsylvania enacted the Act of August 5, 1941, regulating and limiting the rights of slayers in real and personal property and in the benefits from insurance policies arising out of or as a result of the death of the person slain. Section 15 of the Act of 1941 expressly provides that it "shall be construed broadly in order to effect the policy of this State".

(3) That under Section 11(b) of the Act —which deals with "Proceeds of insurance" — if the slain person is beneficiary or assignee of any policy or certificate of insurance on the life of the slayer, the proceeds shall be paid to the estate of the decedent upon the death of the slayer; unless the policy names some person other than the slayer or his estate as alternative beneficiary, or unless the slayer by naming a new beneficiary or assigning the policy performs an act which would have deprived the decedent of his interest in the policy if he had been living.

[4] It seems to me that the question presented in the instant litigation is answered in Section 11(b) of the Act of 1941. Under this Section the proceeds of the policy upon the life of the slayer shall be paid to the estate of the slain person where the slain person is the beneficiary of the policy, *"Unless the policy names some person other than the slayer or his estate as alternative beneficiary,* or unless the slayer by naming a new beneficiary or assigning the policy performs an act which would have deprived the decedent of his interest in the policy if he had been living".

What construction can possibly be placed upon the unequivocal language of Section 11(b) other than that the policy on the life of the slayer is valid, and its benefits payable, regardless of the fact that he had committed a murder, and irrespective as to whether or not he had been "legally executed" for the commission of his crime, as long as the beneficiary is *not* the "slayer or his estate"?

The plaintiff insurance company has argued very vigorously that the Pennsylvania public policy as declared in the Collins case invalidates the insurance policy itself once the slayer has been "legally executed". The public policy as enunciated by the Act of 1941 makes no such distinction with respect to the manner of death of the slayer, and expressly does not invalidate the policy on the life of the slayer. As long as he is dead, and irrespective of how he came to his death, by execution or otherwise, his policy becomes effective with respect to the payment of benefits in accordance with the provisions of Section 11(b), subject only to the exception that the "slayer or his estate" cannot recover.

■ Accordingly, it is my opinion that the Pennsylvania public policy does not invalidate the insurance policy in this case, by reason of the legal execution of the insured; and further, that the Pennsylvania public policy does not bar the instant beneficiary from recovery.

My conclusion is based not only on Section 11(b) of the Act of 1941, and Section 15 of the Act—which, under the caption "Broad construction; policy of state" declares, "This act * * * shall be construed broadly in order to effect the policy of this State that no person shall be allowed to profit by his own wrong, wherever committed"—but also upon the clear distinction repeatedly made in the numerous Pennsylvania decisions between the rights of the wrongdoing insured and his estate on the one hand, and the rights of the innocent beneficiary on the other hand.

■ The rationale of these decisions is, as was stated in Morris v. State Mut. Life Assurance Co., 1898, 183 Pa. 563, 573, 39 A. 52, 55, that the innocent beneficiary is " * * * not bound by any acts or declarations done or made by him [the insured] after the issue of the policy, unless such acts were in violation of some condition of the policy".

■ The Pennsylvania decisions have repeatedly emphasized that in a suit upon a life insurance policy by the designated beneficiary there is no legal identity of title between the insured and the beneficiary. Said the Supreme Court of Pennsylvania in Purcell v. Metropolitan Life Ins. Co., 1940, 336 Pa. 588, 591, 10 A.2d 442, 443: "Whether the insured retains the right to change the beneficiary or not, the legal rights when viewed after the death of the insured are between the insurer and the beneficiary. The beneficiary is suing, as a party to the contract, in her independent right, which does not depend on nor is it representative of any right of the insured. Hamill v. Supreme Council, 152 Pa. 537, 542, 25 A. 645. See also Hermany v. Fidelity Mut. Life Ass'n, supra [151 Pa. 17, 18, 24 A. 1064]."

The Pennsylvania public policy is predicated on the premise that innocent third-party beneficiaries shall be secured in the wholesome protection that life insurance affords. As was well stated by Judge Moscowitz of the United States District Court for the Eastern District of New York, in Prudential Insurance Company of America v. Betty Goldstein, 43 F.Supp. 765, decided February 5, 1942: "In final analysis, the granting of recovery in a case like the present one in no way benefits the criminal who is now dead and at least benefits his named beneficiaries who in most instances will be the persons deprived of support and maintenance by his death. On the other side of the ledger is the purely speculative possibility that a man who knows his kin are cared for by his insurance is more apt to commit a crime punishable by death. In reply to such an assumption, it may well be asked what sort of crime deterrent voiding of a man's life insurance may be, when the penalty of death does not halt his criminal act."

For the reasons stated the defendant's motion to dismiss is granted, and the complaint is dismissed.